UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

**CAROLINA CASUALTY INSURANCE COMPANY,**

      **Plaintiff,**

      v.

**LIBERTY MUTUAL FIRE INSURANCE COMPANY,**

      **Defendant.**

Civ. No. 2:18-cv-04813 (WJM)

OPINION

### WILLIAM J. MARTINI, U.S.D.J.

      This is a declaratory judgment action between insurers. Carolina Casualty Insurance Company ("CCIC" or "Plaintiff") seeks reimbursement from Liberty Mutual Fire Insurance Company ("Liberty" or "Defendant") for a settlement reached between CCIC and its insured, Allegheny Plant Services ("APS"), following a judgment in excess of CCIC's policy limits. Liberty has moved for summary judgment and CCIC has cross moved for summary judgment. ECF Nos. 64, 66. Having reviewed the parties' submissions, the Court decides the motions without oral argument. See Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons set forth below, CCIC's motion is **DENIED** and Liberty's motion is **GRANTED**.

    **I.    FACTUAL BACKGROUND**

      On January 18, 2007, APS employee Robert Whitmore was hauling goods in a tractor-trailer on behalf of Rand-Whitney Container Newtown LLC ("Rand-Whitney") in Maywood, New Jersey. Plaintiff's Statement of Material Facts ("Pl.'s SMF") ¶¶ 4, 6; Pl.'s Ex. E.[1] Pursuant to a 2003 agreement between APS and Rand-Whitney (the "Transportation Agreement"), the tractor-trailer that Whitmore was operating was leased by Rand-Whitney from Ryder Truck Rental, Inc. ("Ryder"). Defendant's Statement of Material Facts ("Def.'s SMF") ¶ 8; Def.'s Ex. C at 2, ¶ 11. While driving the tractor-trailer (the "Ryder Vehicle") east on Essex Street, Whitmore attempted to turn left at an intersection and onto the entrance ramp for Route 17. Pl.'s Ex. E.

---

[1] Defendant attempts to dispute the fact that Whitmore was hauling goods on Rand-Whitney's behalf at the time of the accident, *see* Defendant's Response to Pl.'s SMF ¶ 6, but admits to this very fact in its own Statement of Material facts, *see* Defendant's Statement of Material Facts ¶ 4. As such, the Court will accept this fact as undisputed.

John Kozlik, a Yellow Corporation[2] truck driver in the course of his employment, waved Whitmore into the intersection. Def.'s SMF ¶ 5. Upon making the left turn, Whitmore collided into an automobile traveling westbound on Essex Street (the "Accident"). Pl.'s Ex. E. The automobile was occupied by the operator, Robert J. Curley ("Curley"), and his passenger, Louis Capurso ("Capurso"). Def.'s SMF ¶ 4.

### A. Relevant Insurance Policies

At the time of the Accident, APS was insured by CICC under a commercial transportation insurance policy ("CCIC Policy"). Pl.'s SMF ¶ 1. The CCIC Policy provided commercial automobile liability coverage in the amount of $1,000,000 per occurrence. *Id.* Likewise, Rand-Whitney was insured by Liberty under a business auto policy at the time of the Accident ("Liberty Policy"). Pl.'s SMF ¶ 2. On October 29, 2007, Rand-Whitney provided a telephone report of the Accident to Liberty. Pl.'s Ex. T. Liberty's record of the telephone report lists the claimant as Robert Curley. *Id.*

### B. Previous Lawsuits

#### 1. *The Capurso Action*

On or about December 19, 2008, Capurso commenced a lawsuit (the "Capurso Action") in the Superior Court of New Jersey asserting negligence claims against Whitmore, APS, Rand-Whitney, Robert Curley, and fictitious parties. Pl.'s Ex. M; Pl.'s SMF ¶ 22.

Prior to the commencement of the lawsuit, the record reflects that Capurso's attorney also contacted Ryder about the Accident in February 2007, but Ryder replied that Capurso would need to pursue his claim with Liberty directly since Rand-Whitney elected to provide their own liability insurance. Pl.'s Ex. G. Liberty was ultimately contacted but told CICC in December 2007 that they were "closing [their] file because the claim should be handled by Carolina Casualty per [their] insured" and that "Claimant's attorney was directed to Liberty incorrectly by Ryder." Pl.'s Ex. N. In addition to sending the paperwork they received for Capurso's claim to CICC, they also let CCIC know that they had "been told that [Curley had] a bodily claim too." Pl.'s Ex. N.

Accordingly, after the Capurso Action was filed, Liberty sent a tender letter to CICC, who in turn accepted the tender in March 2009 and confirmed that CICC would defend Rand-Whitney, Whitmore, and APS. Pl.'s Exs. O, V. Specifically, CCIC noted that they "instructed defense council [*sic*] to answer [on Rand-Whitney's] behalf and handle their defense in this matter" and that an answer on Rand-Whitney's behalf had already been filed. Pl.'s Ex. O. Ultimately, CCIC settled the Capurso Action and secured a release for Rand-Whitney and the other defendants. Def.'s SMF ¶ 12. After paying to settle the Capurso Action and pay Curley

---

[2] The parties agree that the record refers to Kozlik's employer by several names, including Yellow Corporation, Yellow Transportation, and Yellow Freight. Def.'s SMF ¶ 5. The name of Kozlik's employer is not material to this litigation.

2

for property damage to his automobile, the CICC Policy was reduced to a balance of $894,681.82. Def.'s Ex. N ¶ 5. On or around April 7, 2009, Liberty closed its file for the Capurso Action for a second time. Def.'s Resp. to Pl.'s SMF ¶ 39.

### 2. *The Curley Action*

On or about September 29, 2008, Curley commenced a personal injury lawsuit (the "Curley Action") against APS, Whitmore, and Kozlik in the Superior Court of New Jersey. Pl.'s SMF ¶ 25; Def.'s Ex. L. Neither Rand-Whitney nor Kozlik's employer were named as defendants. Def.'s SMF ¶¶ 13, 34. CCIC retained counsel to represent APS in the Curley Action. Pl.'s SMF ¶ 26. The case proceeded to trial and on October 4, 2012, the jury awarded a verdict of $1,400,000.00 ($1,567,844.00 with interest) to Curley. Pl.'s SMF ¶ 28. 85% of the liability was apportioned to APS and Whitmore and the remaining 15% of liability was apportioned to Kozlik. Def.'s SMF ¶ 15; Def.'s Ex. L.

On January 7, 2013, the superior court entered a final judgment on the verdict against Whitmore in the amount of $894,681.82, against APS in the amount of $1,224,000.00 plus interest, and against Kozlik in the amount of $216,000.00 plus interest. Def.'s Ex. L. CCIC subsequently paid the remainder of the CCIC Policy—$894,682.82—towards the judgment. Pl.'s SMF ¶ 31; Def.'s Ex. L. On April 16, 2013, the court entered an Amended Order of Judgment stating that because APS was found to be greater than 60% responsible for the Accident, APS was liable for the full amount of the verdict, including interest and costs, under N.J.S.A. 2A:15-5.3. Pl.'s SMF ¶ 32; Def.'s Ex. L.[3] Following CCIC's payment of the remainder of its policy, the balance remaining on the judgment totaled $673,162.21 ("Excess Judgment"). Pl.'s SMF ¶ 42. APS paid the Excess Judgment. Def.'s SMF ¶ 22, Def.'s Ex. F at 32, ¶ 224.

### 3. *The APS Action*

On November 8, 2013, APS filed a lawsuit against CCIC (the "APS Action") in the U.S. District Court for the Western District of Pennsylvania regarding CCIC's management of the Curley Action and resulting Excess Judgment. Def.'s SMF ¶ 19; Def.'s Ex. F. The case, which was ultimately transferred to this District, asserted claims of breach of fiduciary duty, breach of contract, and bad faith in violation of 42 Pa. § C.S. 8371. Def.'s SMF ¶ 19; Def.'s Ex. F at L0457-L0463. Neither Rand-Whitney nor Liberty were named as a defendant. *Id.* at L0424.

On or about March 29, 2017, while the APS Action was ongoing, CCIC contacted Liberty for a copy of the Liberty Policy to examine whether excess coverage from Liberty would be available "for the benefit of [APS] and [Whitmore]." Def.'s Ex. H at L0005. CCIC informed Liberty of the Excess Judgment from the Curley Action and the pending APS

---

[3] Because Kozlik's employer was not named in the suit and Kozlik failed to notify them, it was held post-trial that Kozlik's employer had no duty to indemnify him. Def.'s Ex. H at L0158.

Action. *Id.* On August 9, 2017, Liberty disclaimed coverage, though they stated that "[e]ven if any coverage would have been available to APS or Whitmore assuming timely notice, then, . . . the coverage would be excess." Def.'s Ex. I at L0550. In response to Liberty's disclaimer of coverage, CCIC's counsel asked Liberty on September 20, 2017 to re-evaluate their coverage position and invited them to a global mediation in the APS Action on September 25, 2017. Def.'s Ex. J at L0559. Liberty replied to CICC the same day, reiterating its prior coverage position and declining to attend the mediation. Def.'s Ex. J at L0653. In its letter, Liberty noted that "Allegheny Plant Services, Inc. ha[s] never requested coverage in the Curley matter from Liberty Mutual." *Id.* Consequently, APS's counsel emailed Liberty on September 22, 2017 to ask for Liberty's "participat[ion] in [the September 25th] mediation in order to facilitate a settlement and [t]o extinguish [Liberty's] risk of future litigation and costs." Def.'s Ex. K at L0140. APS's counsel continued that "[s]hould Liberty Mutual opt not to participate and the parties fail to reach a settlement on Monday, it is likely that Liberty Mutual will be pulled into this litigation in the not too distant future." *Id.* APS's counsel then stated that he had "only recently learned of Liberty Mutual's involvement in the underlying claim/lawsuit" and that in the event the case was not settled on September 25th, he expected to seek leave to amend the complaint "to account for these important facts," where "Liberty Mutual could find itself as an additional defendant" in the APS Action. *Id.* Liberty again declined to participate in the September 25, 2017 settlement and "st[ood] by [their] coverage position." *Id.* at L0139. On October 23, 2017, CICC settled the APS Action by reimbursing APS in full for its payment of the Excess Judgment. Def.'s SMF ¶¶ 22, 29.

## II. PROCEDURAL HISTORY

CCIC filed the present action against Liberty on March 29, 2018, seeking a declaratory judgment as to whether Liberty is an excess provider that is responsible for the Excess Judgment. *See* Compl. ¶ 1, ECF No. 1. Specifically, the complaint seeks: (1) a declaration that Liberty must provide a copy of the Liberty Policy and claims file from the Accident; (2) a declaration that Liberty must provide coverage as an excess carrier in the Curley Action; (3) an award to CCIC of the Excess Judgment plus all interest, costs, and disbursements; and (4) an award to CCIC of further relief the Court deems just and proper. *See* Compl. at 5. Liberty answered the complaint on June 1, 2018. *See* Answer, ECF No. 7. After having an opportunity to develop the record through discovery, the parties each moved for summary judgment on February 15, 2022. *See generally* Defendant's Brief in Support of Motion for Summary Judgment ("Def.'s Br."), ECF No. 64; Plaintiff's Brief in Support of Motion for Summary Judgment ("Pl.'s Br."), ECF No. 66.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In deciding a motion for summary judgment, the Court construes all facts and inferences in the light most favorable to the non-moving party. *Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears

4

the initial burden of showing the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact—that is, the "absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986). Once the moving party meets this burden, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a *genuine issue for trial* and do more than simply show that there is some metaphysical doubt as to the material facts." *United States v. Donovan*, 661 F.3d 174, 185 (3d Cir. 2011) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-moving party must present actual evidence that creates a genuine issue for trial—reliance on unsupported assertions, speculation, or conclusory allegations is insufficient to defeat a motion for summary judgment. *Solomon v. Soc'y of Auto. Engineers*, 41 F. App'x 585, 586 (3d Cir. 2002) (citing *Celotex*, 477 U.S. at 324); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (non-moving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit"). Furthermore, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "A fact is 'material' . . . if its existence or nonexistence might impact the outcome of the suit under the applicable substantive law." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Anderson*, 477 U.S. at 248 (1986)). "A dispute over a material fact is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248). Where the parties have filed cross-motions for summary judgment, the summary judgment standard does not change. *In re Cooper*, 542 F. Supp. 2d 382, 385 (D.N.J. 2008) (citing *Appelmans v. City of Phila.*, 826 F.2d 214, 216 (3d Cir. 1987)). The court must consider each motion independently and view the evidence on each motion in the light most favorable to the party opposing the motion. *See Boardwalk Regency Corp. v. Unite Here Loc. 54*, No. CIV.08-0016, 2009 WL 540675, at *4 (D.N.J. Mar. 3, 2009) (first citing *Williams v. Philadelphia House Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994); and then citing *Matsushita*, 475 U.S. at 587).

## IV.  DISCUSSION

Liberty argues that it is entitled to summary judgment because (1) APS and Whitmore do not qualify as "insureds" under the Liberty policy; (2) APS, Whitmore, and CICC had no expectation of coverage from Liberty and failed to timely comply with the notice provisions of the Liberty Policy; (3) CCIC conceded that it breached its duties to APS through its settlement of the APS Action and thus has no legal or equitable basis to shift its liability to Liberty; (4) the Transportation Agreement required APS to assume all risks relating to the negligent performance of hauling services and does not support any equitable subrogation or contribution claim by CICC against Liberty; and (5) CICC should be judicially estopped from asserting that APS and Whitmore are "insureds" under the Liberty Policy. *See generally* Def.'s Br. at 4-20.

5

CCIC in turn argues that it is entitled to summary judgment because (1) APS and Whitmore are "insureds" under the Liberty Policy; (2) Liberty's disclaimer of coverage over the Excess Judgment was improper because CCIC timely complied with the notice provisions of the Liberty Policy; and (3) CCIC upheld its obligations as a primary insurer and handled the Curley Action reasonably and in good faith. *See generally* Pl.'s Br. at 13-39.

The Court need only address the parties' arguments concerning whether APS and Whitmore qualify as "insureds" under the Liberty Policy to conclude that Liberty is entitled to summary judgment on all of CCIC's claims.

### A. "Who Is An Insured" Under the Liberty Policy

The Liberty Policy states that Liberty "will pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'" Pl.'s Ex. B at 89. The parties dispute whether APS qualifies as an "insured" under the Liberty Policy.[4] If APS is not an "insured," then it is not entitled to coverage under the Liberty Policy.

The Liberty Policy states, in part, that the following are "insureds":

   a. You for any covered "auto".
   b. Anyone else while using with your permission a covered "auto" you own, hire or borrow . . . [.]

Pl.'s Ex. B at 89. "You" and "Your" refer to Rand-Whitney Group LLC, the named insured. Pl.'s Ex. B at 88. "Auto" is defined in relevant part as a "land motor vehicle, 'trailer' or semitrailer designed for travel on public roads[,]" Pl.'s Ex. B at 97, and under the Liberty Policy at issue here, "[a]ny '[a]uto'" is considered a covered auto. Pl.'s Ex. B at 3, 88. Thus,

---

[4] Both parties primarily cite to and rely on New Jersey law for the interpretation of the Liberty Policy in their briefs but acknowledge in footnotes that Massachusetts law may be applicable in the alternative. *See* Def.'s Br. 8-9 n.1; Pl.'s Br. 13-14 n.3. CCIC is an Iowa corporation with a principal place of business in Iowa, while Liberty is a Wisconsin corporation with a principal place of business in Massachusetts. Pl.'s Corp. Disclosure, ECF No. 2; Def.'s Corp. Disclosure, ECF No. 8. "As a federal district court sitting in diversity, this Court must apply the choice of law rules of New Jersey, the forum state, to determine the applicable substantive law." *Edelman v. Croonquist*, No. CIVA 09-1938, 2010 WL 1816180, at *2 (D.N.J. May 4, 2010) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)). "The first step in any choice-of-law inquiry under New Jersey law requires the court to determine whether there is an actual conflict between the laws of the potential forums." *Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 289 (3d Cir. 2017) (citation omitted). If there is no actual conflict, the inquiry is over and the court will apply New Jersey law. *Id.* (citation omitted). "If there is an actual conflict, then the court must determine which forum has the most significant relationship with the parties and the contract." *Id.* (citation and internal quotation marks omitted). Here, neither party has asserted, and the Court has not found, any Massachusetts law in conflict with New Jersey law. As such, the Court will apply New Jersey law. *See MacKay v. Avison*, 196 A.2d 691, 695 (N.J. App. Div. 1964) (presuming that the parties were content to have New Jersey law apply where plaintiff did not raise any statutory or decisional law of Connecticut).

6

for APS to qualify as an "insured" in regards to the Curley Action, APS must have been using the Ryder Vehicle with Rand-Whitney's permission, and the Ryder Vehicle must have been "own[ed], hire[d], or borrow[ed]" by Rand-Whitney. The parties dispute whether the Ryder Vehicle was "hired" or "borrowed" under the Liberty Policy.

"Whether an insurance policy provides coverage to an insured is a question of law to be decided by the Court." *Spiniello Companies v. Hartford Fire Ins. Co.*, No. CIV A 07CV2689, 2008 WL 5046831, at *2 (D.N.J. Nov. 21, 2008) (citing *Atlantic Mut. Ins. Co. v. Palisades Safety & Ins. Ass'n*, 837 A.2d 1096 (N.J. Super Ct. App. Div. 2003)). The burden of establishing that coverage exists under an insurance policy rests with the party seeking coverage. *New Jersey Manufacturers Ins. Grp. v. Narrangassett Bay Ins. Co.*, No. CV 17-01112, 2018 WL 6427868, at *6 (D.N.J. Dec. 7, 2018) (citing *Hartford Accident & Indem. Co. v. Aetna Life & Cas. Ins. Co.*, 483 A.2d 402, 408 (N.J. 1984)). "In interpreting insurance contracts, 'the words of an insurance policy should be given their ordinary meaning, and in the absence of an ambiguity, a court should not engage in a strained construction to support the imposition of liability.'" *Nat'l Interstate Ins. Co. v. Champion Truck Lines, Inc.*, No. CIV.A. 11-5097, 2013 WL 1192395, at *3 (D.N.J. Mar. 21, 2013) (quoting *Longobardi v. Chubb Ins. Co.*, 582 A.2d 1257, 1260 (N.J. 1990)). "The court's responsibility is to give effect to the whole policy, not just one part of it." *Cypress Point Condo. Ass'n, Inc. v. Adria Towers, L.L.C.*, 143 A.3d 273, 280 (N.J. 2016) (citation and internal quotation marks omitted). Further, the court "must endeavor to give effect to all terms in a contract and the construction which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable." *Zurich Am. Ins. Co. v. Keating Bldg. Corp.*, 513 F. Supp. 2d 55, 64 (D.N.J. 2007) (internal quotation marks omitted) (quoting *Linan-Faye Constr. Co. v. Housing Auth.*, 995 F. Supp. 520, 524 (D.N.J. 1998) (quoting *Prather v. Am. Motorists Ins. Co.*, 67 A.2d 135 (N.J. 1949))).

"An insurance policy is not ambiguous merely because two conflicting interpretations of it are suggested by the litigants." *Oxford Realty Grp. Cedar v. Travelers Excess & Surplus Lines Co.*, 160 A.3d 1263, 1270 (N.J. 2017) (citations and internal quotation marks omitted). "Nor does the separate presentation of an insurance policy's declarations sheet, definition section, and exclusion section necessarily give rise to an ambiguity." *Id.* However, "[i]f the terms of the contract are susceptible to at least two reasonable alternative interpretations, an ambiguity exists." *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1289 (N.J. 2008). When "an ambiguity exists, the court will resort to tools and rules of construction beyond the corners of the policy." *Oxford Realty Grp.*, 160 A.3d at 1270 (citation and internal quotation marks omitted). "[C]ourts frequently look to how other courts have interpreted the same or similar language in standardized contracts to determine what the parties intended, especially where rules in aid of interpretation fail to offer a clear result." *Chubb Custom Ins. Co.*, 948 A.2d at 1289.

CCIC asserts that because insurance policies are contracts of adhesion, the Court should construe the Liberty Policy in the insured's favor, and where ambiguities exist, the Court's interpretation of the policy should take the insured's reasonable expectations into

7

account. Pl.'s Br. at 18-19. While New Jersey courts do ordinarily construe insurance contract ambiguities in favor of the insured, sophisticated commercial insureds—such as the relevant insureds in this case—do not receive this benefit. *Oxford Realty Grp.*, 160 A.3d at 1270 ("Sophisticated commercial insureds . . . do not receive the benefit of having contractual ambiguities construed against the insurer."). Further, the doctrine of reasonable expectations, where "the insured's reasonable expectations are brought to bear on misleading terms and conditions of insurance contracts and genuine ambiguities are resolved against the insurer," is "less applicable to commercial contracts." *Id.* at 1271 (citations and internal quotation marks omitted). Because the putative insureds in this case, APS and Whitmore, are a carrier company and its employee, the Court declines to apply the doctrines asserted by CCIC in its interpretation of the Liberty Policy.

### B. Plain Meaning of "Hire" and "Borrow"

The parties assert, and an examination of the policy as a whole reveals, two reasonable interpretations for the terms "hire" and "borrow" in the applicable "Who Is An Insured" section, thus rendering the terms ambiguous. *See Chubb Custom Ins. Co.*, 948 A.2d at 1289.

"Hire" and "borrow" are not explicitly defined in the Liberty Policy's "Definitions" section, "Who Is An Insured" section, or other sections. However, the "Covered Autos" section, which immediately precedes the "Who Is An Insured" section, provides some context. *See* Pl.'s Ex. B at 88. The "Covered Autos" section defines the categories of automobiles that can be covered under plans offered by Liberty Mutual, though these definitions relate to whether an auto is a "covered 'auto'" under the "Who Is An Insured" section, and not to whether the entity using the covered auto constitutes an "insured." *But see Ins. Co. of State of Pennsylvania v. Cont'l Nat. Indem. Co.*, 7 F. App'x 503, 509 (6th Cir. 2001) (assuming that the definition of "hired auto" in the covered autos section of a policy also defined the term "hire" in the section of the policy that defined insureds). Rand-Whitney's plan covers "Any 'Auto,'" but the "Covered Autos" section provides definitions for other categories of vehicles such as "Owned 'Autos,'" "Owned Private Passenger 'Autos,'" "Hired 'Autos,'" and "Nonowned 'Autos.'" Pl.'s Ex. B at 88.

In the "Covered Autos" section, "Nonowned 'Autos'" is defined in part as "[o]nly those 'autos' you do not own, *lease*, *hire*, rent or *borrow*." Pl.'s Ex. B at 88 (emphasis added). Citing to *Zurich American Ins. Co. v. Keating Bldg. Corp.*, 513 F. Supp. 2d 55, 63 (D.N.J. 2007), Liberty argues that under "well-settled rules of policy construction," a separate meaning must be ascribed to "lease," "hire," and "borrow." Def.'s Br. 5. Under this construction, a leased vehicle cannot also be hired or borrowed. CCIC responds by pointing out that "Hired 'Autos'" is similarly defined in the "Covered Autos" section as "[o]nly those 'autos' you *lease*, *hire*, rent, or *borrow*." Pl.'s Ex. B at 88 (emphasis added); Plaintiff's Opposition Brief ("Pl.'s Opp. Br.") at 6, ECF No. 74. Because Rand-Whitney leased the truck from Ryder, CCIC asserts that the Ryder Vehicle should constitute a "hire[d]" auto for the purposes of the "Who Is An Insured" section. Pl.'s Opp. Br. 6. CCIC also argues, seemingly in the alternative, that these competing definitions for "Nonowned" and "Hired 'Autos,'"

8

along with the omission of the word "lease" under the "Who is an Insured" section of the Liberty Policy, create an ambiguity as to whether a leased vehicle is a "hired" vehicle for the purpose of whether APS and Whitmore are "Insureds" under the Liberty Policy. Pl.'s Opp. Br. 6.

Reading the insurance policy as a whole, the definition of "Hired 'Autos'" in the "Covered Autos" section informs the definition of "hire" in the "Who Is An Insured" section. However, because "Hired 'Autos'" and "Nonowned 'Autos'" use "lease, hire, rent [and] borrow" in their definitions, "lease" and "hire" must each have their own meaning. The Court holds that these competing definitions of "hire" and "borrow," as used in the relevant "Who Is An Insured" section, are ambiguous.

### C. Control Analysis

Finding that the definitions of "hire" and "borrow" are ambiguous, the Court looks to "how other courts have interpreted the same or similar language in standardized contracts to determine what the parties intended[.]" *Chubb Custom Ins. Co.*, 948 A.2d at 1289. Several courts have examined the meaning of the term "hired auto" in the hauling context. "The key inquiry regarding whether an automobile will fall within the hired automobiles provision of the policy is whether the insured exercised dominion, control or the right to direct the use of the vehicle." *Nat'l Interstate Ins. Co. v. Champion Truck Lines, Inc.*, No. CIV.A. 11-5097 JBS, 2013 WL 1192395, at *3 (D.N.J. Mar. 21, 2013) (internal quotation marks omitted) (quoting *Selective Way Ins. v. Travelers Prop. Cas. Co. of Am.*, 724 F. Supp. 2d 520, 526 (E.D. Pa. 2010)). When evaluating the degree of control exercised by the insured, courts primarily consider "the degree of control exerted over the vehicle, driver, and route," *Nat'l Interstate Ins. Co.*, 2013 WL 1192395, at *3 (internal quotation marks omitted) (quoting *Selective Way Ins.*, 724 F. Supp. 2d at 527), and "note that minimal levels of control do not render an auto 'hired.'" *Selective Way Ins.*, 724 F. Supp. 2d at 527.

Liberty argues that Rand-Whitney "exercised no control over the truck" because it delegated responsibility to APS for the selection and supervision of drivers, the setting of routes, the maintenance of the Ryder Vehicle, and the employment of Whitmore. Def.'s Br. at 5. CCIC responds that Rand-Whitney did exercise control over the Ryder Vehicle by providing the vehicle for APS to use and by directing APS's tender of freight, designating the point of origin and destination for each shipment, and stipulating the points of stop-offs for partial unloading. Pl.'s Opp. Br. 7-8. CICC asserts in the alternative that there is a genuine issue of material fact as to Rand-Whitney's control of the vehicle. Pl.'s Opp. Br. 8.

Courts have taken a fact-specific approach when considering whether an entity possesses sufficient control over an auto to be said to have "hire[d]" it. *See U.S. Fid. & Guar. Co. v. Heritage Mut. Ins. Co.*, 230 F.3d 331, 333-34 (7th Cir. 2000) ("Although we are not the first court to determine the scope of a hired-automobile clause, the fact specific nature of the inquiry makes prior cases of limited help[.]"). After an examination of the Transportation Agreement between APS and Rand-Whitney, the Court finds that Rand-Whitney did not

9

possess a level of control over the Ryder Vehicle sufficient to have "hire[d]" it under the Liberty Policy.

1. *Vehicle*

When analyzing control over the vehicle, courts have considered the provision and maintenance of the relevant vehicle as indicia of control. *See Nat'l Interstate Ins. Co.*, 2013 WL 1192395, at *4 (noting that an entity did not hire an auto and its driver partly because it "did not provide or maintain [the driver's] equipment"); *see also, e.g.*, *U.S. Fid. & Guar. Co.*, 230 F.3d at 333 (noting in its hired vehicle analysis that an entity "provided the maintenance and the fuel for the trucks"). According to the Transportation Agreement, Rand-Whitney was responsible for "provid[ing] and keep[ing] available" vehicles for APS's use in tendering Rand-Whitney's freight. Pl.'s Ex. I at RW0013. Rand-Whitney also provided credit for the average cost per gallon of fuel for the period that APS provided transportation services for its commodities, though it did not provide the fuel directly. Pl.'s Ex. I at RW0021. Further, these vehicles, including the Ryder Vehicle, were to be domiciled at Rand-Whitney's facility in Newtown, Connecticut. Pl.'s Ex. I at RW0013; *see also* Def.'s Ex. O. However, APS, at its own expense, was responsible for all maintenance and repairs to the vehicles that were not already provided to Rand-Whitney by Ryder. Pl.'s Ex. I at RW0013. Notably too, APS was permitted to use the vehicles to perform backhauls, or carriage services for third parties other than Rand-Whitney on return trips, for its own benefit and at its own expense. Pl.'s Ex. I at RW0014. APS also provided trailers to Rand-Whitney for the provision of the carriage services. Pl.'s Ex. I at RW0014.

2. *Driver*

Courts have also considered in their control analysis whether an entity employed, paid, provided benefits for, or otherwise managed the driver of the auto. *See Nat'l Interstate Ins. Co.*, 2013 WL 1192395, at *4 (noting that an entity did not hire an auto and its driver partly because it did not choose the driver to perform the job and did not pay him); *see also U.S. Fid. & Guar. Co.*, 230 F.3d at 335 (considering that an entity "paid the drivers for the amount of material they hauled and paid their benefits" in its control analysis); *Chicago Ins. Co. v. Farm Bureau Mut. Ins. Co. of Arkansas*, 929 F.2d 372, 374 (8th Cir. 1991) (noting that the driver "remained an employee of [the entity whose insurer sought contribution]" and that the same entity was "maintaining his workers' compensation insurance"). Under the Transportation Agreement, APS was responsible at its sole cost and expense for providing a full-time supervisor on Rand-Whitney's premises and at least eight full-time drivers for its performance of services. Pl.'s Ex. I at RW0014. The agreement specifies that these personnel were to be employees of APS and that APS was to have "exclusive control and direction" over them. Pl.'s Ex. I at RW0014, RW0016. APS was responsible for their "selection, training, supervision[,] and management," and paid all their "wages, taxes, benefits[,] and costs." Pl.'s Ex. I at RW0014. Further, APS was to ensure that the personnel were "competent and properly licensed for the performance of their duties" under the Transportation

Agreement. *Id.* APS was also responsible for providing drivers with clean uniforms that met the specification of Rand-Whitney. *Id.*

### 3. Route

Control over the route is another factor commonly evaluated by courts when performing a control analysis in the hauling context. *See Nat'l Interstate Ins. Co.*, 2013 WL 1192395, at *4 ("[T]here is no indication in the record that [the entity whose insurer sought primary coverage] instructed [the driver] as to the specific route he was supposed to take or how to operate his vehicle."); *see also U.S. Fid. & Guar. Co.*, 230 F.3d at 335 ("[The entity] did not dictate the routes the drivers must use nor did it maintain exclusive control over them."); *Earth Tech, Inc. v. U.S. Fire Ins. Co.*, 407 F. Supp. 2d 763, 773 (E.D. Va. 2006) ("[T]he record demonstrates that [entity] did not exercise any control over the vehicle beyond specifying the type of vehicle and the locations of the pick-up and delivery of the material."). Attendant to this, Courts have also considered whether an entity procures the licenses, permits, taxes, and insurance for the vehicle performing the hauling. *See Chicago Ins. Co.*, 929 F.2d 372 at 374 (considering that an entity was issued hauling permits and carried insurance on the trucks in its control analysis); *Earth Tech, Inc.*, 407 F. Supp. 2d at 773 (considering that an entity paid for transportation and waste taxes in its control analysis). Here, Rand-Whitney "designate[d] the point of origin and destination for each shipment and . . . stipulate[d] the point or points where stop-offs, if any, [were] made for partial unloading." Pl.'s Ex. I at RW0013. APS then used this information to set the routes to be taken, Def.'s Ex. E at 171-172, ¶ 12, though this responsibility is not delineated in the Transportation Agreement.[5] Further, APS was required to, at its own cost and expense, "procure and maintain all licenses and permits and pay all taxes, including receipts taxes, associated with the transportation services performed under [the Transportation Agreement.]" Pl.'s Ex. I at RW0016. APS was also required to procure and maintain insurance throughout the term of the Transportation Agreement. *Id.*

While Rand-Whitney possessed a degree of control over the Ryder Vehicle by providing and domiciling the truck, crediting the cost of fuel to APS for transport on its behalf, and designating the points of origin, destination, and stop-offs, courts have found that similar levels of control are not sufficient to have "hire[d]" the auto. *See Chicago Ins. Co.*, 929 F.2d at 374 (8th Cir. 1991) (holding that an entity had only "limited supervisory powers" where it could: (1) require trucks to have hauling permits; (2) take a fee on weight tickets; (3) tell drivers what they were transporting and where to pick it up; (4) resolve disputes between drivers; and (5) remove unsatisfactory drivers); *Earth Tech, Inc.*, 407 F. Supp. 2d at 773 ("Because Capitol was interested only in the results of transportation from point A to point B,

---

[5] CCIC attempts to dispute this fact by citing to language in the Transportation Agreement. Pl.'s Resp. to Def.'s SMF at ¶ 9; *see* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence . . . of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."). However, the Transportation Agreement does not directly discuss which entity set the routes taken by the drivers between these points—it discusses only the points of origin, destination, and stop-offs for the carrier. As such, it does not put this fact in dispute.

11

and did not otherwise exercise any control over the transportation of the vehicle, the vehicle was not a 'hired auto,' and therefore it was not covered by Capitol's insurance policy with U.S. Fire."); *Selective Way Ins.*, 724 F. Supp. 2d at 529 (holding that the ability to exert control over where and when to load and unload cargo, provide a bill of lading to the driver, and require drivers to follow the same procedures as its own employees was only an indication of "minimal control . . . insufficient to render the truck a 'hired auto'"). As such, while Rand-Whitney possessed limited control over the vehicles under the Transportation Agreement, particularly since it provided and domiciled the vehicles, such control is "insufficient to render [the Ryder Vehicle] a 'hired auto.'" *Selective Way Ins.*, 724 F. Supp. 2d at 529. APS, by contrast, is the entity that maintained and repaired the vehicles used for hauling services under the Transportation Agreement, provided trailers, and determined when the vehicle would be used for backhaul operations. APS also hired, trained, managed, evaluated, and licensed the drivers and supervisors provided under the Transportation Agreement, set the routes, acquired insurance for the vehicle, paid all applicable taxes, and procured all licenses and permits necessary for performing the hauling services.

### D. "Borrowed" Analysis

The analysis of whether a car is "borrowed" is similar to the control analysis for hired autos. In *Atlantic Mutual Insurance Co. v. Palisades Safety & Insurance Association*, 837 A.2d 1096, 1099 (N.J. App. Div. 2003), the Appellate Division of the New Jersey Superior Court considered a nearly identical "Who Is An Insured" section to determine whether an employer was "borrowing" an auto owned by its employee's wife while the employee ran an errand for his supervisor. The *Atlantic Mutual* court relied on a definition of "borrower" that required the entity to have "dominion or control" over the vehicle and held that "the 'user' of the vehicle must also have the simultaneous authority to move the vehicle[.]" *Id.* There, the court considered factors similar to those considered in the "hired auto" analysis discussed *supra*, such as whether the employer paid the driver and considered his driving to be in furtherance "company business," to hold that the employer's insurer provided liability coverage to the driver. *Id.* at 1099-1100. As such, applying the same control analysis as above relating to whether Rand-Whitney "hired" the Ryder Vehicle, the Court finds that Rand-Whitney also did not exercise "dominion or control" over the Ryder Vehicle at a level requisite to have "borrowed" the truck under the Liberty Policy.

### V.   CONCLUSION

Because Rand-Whitney cannot be said to have "hire[d]" or "borrow[ed]" the Ryder Truck under the "Who Is An Insured" section of the Liberty Policy, APS and Whitmore are not Liberty's "insureds" and thus cannot seek coverage from Liberty for the Accident.

For the reasons set forth above, CCIC's motion is **DENIED** and Liberty's motion is **GRANTED**.

An appropriate Order shall follow.

13

_/s/ William J. Martini_
**WILLIAM J. MARTINI, U.S.D.J.**

**Date:  October 17, 2022**